STATE v. SENN.

1. In a murder case, a physician, who examined externally the body of the deceased, was competent to express an opinion as to what agency was capable of producing marks of bruises observed on the neck of the deceased, but he should not have been permitted to testify that in his opinion such marks were in fact produced by a particular agency—the human hand.

2. On the trial of a husband for the murder of his wife, testimony is inadmissible to prove an alleged threat by the prisoner against his wife, as detailed by her on the witness stand in his hearing, and not denied by him, in a proceeding before a trial justice, to which the husband was no party; for he was not then called upon to deny the charge so made, nor would his denial have been admissible in evidence under the rules of law.

3. Testimony given by witnesses at a coroner's inquest, is inadmissible against them on their trial, under a charge afterwards preferred, of the murder of the deceased person.

4. It being shown by affidavits, that the jury, during the night and while deliberating on their verdict, came from their room into the court room and there mingled with the constables of the court, the verdict was set aside.

MR. JUSTICE McGowan, *dissenting.*

*Per* McGowan, A. J.—

5. There is no error in defining "reasonable doubt" to be a "strong, substantial, well founded doubt, founded in the evidence."

6. A mere slip of the tongue in a charge to the jury, and one which could not possibly have misled the jury, does not furnish a ground for a new trial.

7. The trial judge did not abuse his discretion as to the conduct of the trial, in permitting a witness to be recalled in reply to prove a statement by defendant which defendant had not denied making.

8. Evidence that the deceased (wife of defendant) had procured a peace warrant against the prisoner was admissible against him.

9. After verdict, it is too late to raise the objection that deceased's name was Mellissa Ozella Senn, and not M. Ozella Senn, as charged in the indictment.

10. Affidavits of jurors should not be received to impeach their verdict or to show an intent not expressed by its words.

Before KERSHAW, J., Spartanburg, October, 1888.

The case is thus fully stated in the separate and dissenting opinion of Mr. Justice McGowan:

At the October term of the court (1887) for Spartanburg County, the defendants, David N. Senn and Helena Boland, were tried and convicted for the murder of M. Ozella Senn, wife of the said David N.  There is no copy of the indictment in the "Brief," nor "Case" stated—only portions of the evidence being printed—and therefore it is necessary to give a short outline of the facts in order to make intelligible the several points raised on the appeal.

David N. Senn and wife lived in the County of Newberry, and near by, almost as members of his family (within the circle of 100 yards), lived his mother and her sister, Mrs. Lucy Lake, an invalid lady, and also his brother-in-law, P. B. Boland, who had a sister, Helena Boland.  With a view, as stated, to show a motive for the killing, the State introduced testimony to the effect that a criminal intimacy existed between the defendants, David N. Senn and Helena Boland, prior to the death of Senn's wife. There was evidence tending to show, that Senn and his wife did not live together happily, and at times were separated; that on one occasion (precise time not stated), Senn's wife (Ozella) prosecuted his mother for an alleged assault upon her (Ozella), for something she had said about an attempt to poison her.  Senn, her husband, was not in the case—refused even to testify as a witness—but, being present, his wife charged him with having said to her, "that if he heard any more about that poison, or something of the kind, that he would burst —— out of her with an axe—that he could see her dead and in ——, and he could rake the coals of fire over her," and to this Senn said nothing.  To this testimony the defendants objected, but the judge ruled that any statements this lady made in the presence of Senn, and also in the presence of this witness, this witness can testify to.

On August 9, 1886, W. G. Peterson, a trial justice of the County of Newberry, at the instance of Mrs. Ozella Senn, issued a *peace warrant* against her husband, Senn, who entered into a recognizance to keep the peace, without any investigation.  To a suggestion, that it might be better for the parties to separate, David N. Senn objected, saying he had done nothing to go to jail for, and he would not run away.  His wife consented to go home with him, and seems to have done so.

On Monday morning (August 23), Dr. J. P. Pool, of Spartan-
burg County, was summoned to go to the house of his neighbor,
John T. Senn, and upon arriving there, John T. introduced him
to his brother, David N. Senn, who had just arrived, who wanted
a certificate from him of the cause of his wife's death; that he
did not think that his family or friends, or her friends, down in
Newberry would be satisfied unless there was some statement of
the cause of her death.  The doctor asked him in reference to the
previous health of his wife, and he gave him to understand that
it had been delicate; that, as well as remembered, she had had
chronic chills.  He stated that she "had eaten a peck of green
peaches" in travelling on Sunday; that he lived in Newberry
County (about 35 miles off); he was coming up the country to
rent land; he thought it would improve his wife's health.  When
asked why he had been so long on the road, and "camped" within
a mile and a half of his destination, he said his team was weak,
and he had been misdirected.

The doctor continued: "I then went to see the body.  It was
dressed, and I did not examine any part except the head and the
neck.  When the face was uncovered, I found it was congested;
that every capillary was distended to its utmost capacity.  I found
a bruise over the left eye, a little below the edge of the hair; it
was between three-quarters and an inch long; the outer skin was
abraded; it was broken for a little over a quarter of an inch, and
the blueness was between three-quarters and an inch long.  There
was also a bruise across the nose, between a quarter and a half
inch wide, extending entirely across the nose and down on either
side of the nose.  Then I examined the neck.  I found the neck
on either side, from a little above the collar bone to the lower
part of the ears, was a blue streak, extending near to the collar-
bone, but it did not go down to the collar-bone; but it extended
from an inch above the collar-bone backwards to the ear.  On the
left side it seemed deeper than on the right.  The *ecchymosis*, as
we call it, or effusion of blood, was greater on the left side than
on the right.  But it was dark on both sides."  When asked what,
in his judgment, produced these streaks and bruises on the neck,
objection was made to the question; but the judge ruled, being a
physician, "if he had an opinion, the witness could express it";

and the witness answered, "My opinion was, that they were made by some external force; but what that was, whether it was a rope or a hand, I could not say, but was inclined to think it was a hand."

The wagon party, with the dead body of Mrs. Senn, seemed to have returned at once to Newberry; for on Wednesday, August 25, J. N. Bass, the coroner of Newberry County, with W. G. Peterson, Esq., as his clerk, held an inquest over the body of Mrs. Senn, which was then buried. The coroner, Bass, and his clerk, Peterson, both testified that at "the inquest" David N. Senn and Helena Boland were examined as witnesses as to the circumstances under which Mrs. Ozella Senn came to her death; that their statements were taken down in writing (which, as it incidentally appeared, were in court, but not called for). Each of the witnesses was proceeding to state the accounts which Senn and Helena Boland had given at the inquest as to the circumstances attending the death of their fellow-traveller. The defendants interposed an objection to the testimony, but the judge ruled "that he knew of no principle of law upon which he could exclude the declarations made by the parties before the coroner. There was no case, then, made at all. The parties were said to have been in company with the deceased, and it was entirely proper that they should be there" (at the inquest). The statements were then put in evidence.

There is some reference in the "Brief" to a second inquest, and a week after, on September 3rd, the defendants, David N. Senn and Helena Boland, were arrested for the murder. There were no requests to charge. After deliberating all night, the jury found the following verdict: "Guilty, but strongly recommended to the mercy of the court." A motion was made for a new trial on the following grounds [*c, e, f, h,* being omitted, because abandoned]: "(*a*) That persons other than the jury were present with the jury during the time that the case was under advisement; said persons being inside the jury room where the jury were confined, and sitting and being in the midst of them at different times and for various lengths of time, and, in the case of one of the said persons, being present during almost the entire night, or time of their deliberation; this without the presence of the presiding

judge and the defendants or their counsel. (*b*) Because the ver-
dict does not indicate to the court which of the defendants is
guilty, and does not cover both the defendants. (*d*) Because
there is a variance between the allegation of the indictment and
the evidence in the case as to the persons, or name of the person,
with whose death the defendants are charged. (*g*) Because there
is now no law under which these defendants could have a trial, or
be convicted. (*i*) Because the verdict, taken in its entirety and
in connection with the evidence, is inconsistent and contradictory,
&c." (Let the affidavits of jurymen, S. C. Miller, H. H. Gram-
ling, C. E. Fleming, and J. A. Cleveland, be inserted in the
report of the case. Gramling and Fleming each made two affi-
davits.)

The judge refused the motion for a new trial, among other
things saying: "As to the alleged errors of the presiding judge,
I have endeavored very conscientiously, ever since I have been
on the bench, to admit an error, and correct it as far as in my
power. * * * All the matters which are urged upon the evi-
dence and upon the affidavits of the jurors, and the affidavits in
regard to access to the jury, and all those matters appertaining
to the conduct of the case since the jury retired, all of these are
very proper subjects of consideration by the Supreme Court.
Those matters are not concluded by anything that I decide here.
It is proper, probably, to present those matters to them, in order
to have a better access to the Supreme Court. The only thing
that I do conclude, and, it seems to me, the only thing I am
chargeable with on this occasion, is to determine whether, upon
the facts of the case, and the rulings during the progress of it, I
ought to grant a new trial. This is a matter which has been
exercising me from the time these unfortunate people were con-
victed. I have considered these matters during the progress of
the case very earnestly, and I do not find that any error has been
committed in regard to the admission of evidence, or any erroneous
charge to the jury, or any omission to prove anything that ought
to be proved in the case. I think it was a case for the jury, and
being a case of circumstantial evidence, if it produced conviction
on their minds, I cannot say—it is impossible for me to say—that
there is not sufficient evidence to justify this finding. I wish it

was otherwise. I am not devoid of the ordinary feelings of humanity; and I hope, if there be any error whatever in this conviction, that the Supreme Court may give the relief which it is impossible for me to give. In view of the great and uncommon zeal and earnestness displayed by the counsel, I would like to be able to take a more favorable view of it; but I find myself utterly powerless to do that. This case will have to be reviewed in the Supreme Court," &c.

The defendants appeal to this court on the following grounds:

"1. Because the presiding judge erred in ruling that J. P. Pool, an expert witness for the prosecution, was at liberty to express his opinion as to what certain marks on the throat of the deceased 'were made by.'

"2. Because the judge erred in admitting the testimony of W. G. Peterson, to the effect that M. Ozella Senn, in her life time, had made certain statements to him as trial justice, in the presence of the defendant, D. N. Senn.

"3. Because the judge erred in admitting the testimony of W. G. Peterson, to the effect that he, as trial justice, issued a warrant for the defendant, David N. Senn, at the instance of his wife, M. Ozella Senn.

"4. Because the judge erred in admitting the testimony of J. N. Bass, as to the statements made before him as coroner, at the inquest, by the defendant, Helena Boland, while she was under oath and on examination as a witness (and, by amendment of the "Brief," the same as to the testimony of David N. Senn).

"5. Because the judge erred in admitting the oral testimony of J. N. Bass, to prove what was the testimony of the defendant, Helena Boland, at the inquest, at which she was sworn as a witness, and her evidence taken down in writing and subscribed by her (and by amendment of the "Brief," the same as to the testimony of David N. Senn).

"6. Because the judge erred in admitting J. T. Pool, a witness for the prosecution in reply, to testify as to certain statements made to him by the defendant, D. N. Senn, and which the defendant, while on the stand, had not denied making.

"7. Because the judge erred in refusing defendant's motion for

a new trial, based on the following grounds: [Here follow the grounds before indicated].

"8. Because the judge, in his charge to the jury, spoke of the defendants, D. N. Senn and Helena Boland, as husband and wife, whereas there was no testimony to that effect.

"9. (By amending the "Brief.") Because the judge erred in charging the jury, that 'a reasonable doubt is' a strong, substantial, well founded doubt, founded in the evidence," &c.

The affidavits submitted on the motion for a new trial were as follows:

"Personally comes *S. C. Miller*, and being duly sworn, deposes and says: That he was a juror in the trial of this case. That the recommendation to the mercy of the court was intended to prevent the execution of the defendants. That the word 'strongly' was placed in the verdict designedly, and was intended to express a fixed opposition to their execution, founded upon a conviction as to the character of the evidence in the case. That five of the jurors, including himself, were in favor of a verdict of not guilty. That they adhered to this verdict. That they at last yielded to the other seven on the express condition that their conviction of doubt as to the guilt of the defendants should not be outraged by their execution. That his doubts were so strong that had he not fully understood that the verdict at last rendered would prevent an execution, he would have remained upon the jury to this moment."

"I have read the above affidavit of Mr. S. C. Miller and concur in every syllable of it, and do now protest against the hanging of the defendants. This protest I make most solemnly, for their execution would be a violation of our verdict."

Sworn to by *H. H. Gramling.*

*C. E. Fleming*, sworn: "I swear that I was foreman of the jury in the above case. That the purpose of the jury in finding the verdict that they did was to induce a commutation of the death penalty. That it was a compromise verdict, and was the method adopted by those in favor of a verdict of 'not guilty,' and the rest of the jury to come to any agreement at all. That the execution now of the defendants would not be in accord with the intention of the jury. That I most earnestly recommend now

that the verdict of the jury be acquiesced in, and that the death penalty be commuted."

*H. H. Gramling*, sworn, says: "That two of the constables of the court were in the jury room during the period that they had the case under advisement. That one of them delivered a message from the presiding judge. That one of them sat in the group in which the jury sat at several times during the night in the midst of the jurymen. That other words were spoken other than those prescribed by law as to an agreement on a verdict. That one of the constables sat inside of the jury room during the entire night. That all the jury had refreshments, and some of them had bed-clothing furnished them."

*J. A. Cleveland*, sworn, says: "That two of the constables of the court were at different times in the jury room in the midst of the jury during the consideration of the above stated case. That one of said constables sat in the group of the jurymen at different times for a considerable length of time on each occasion. That there was some one other than the jury in the jury room with them during the entire night."

*C. E. Fleming,* sworn, says: "That in the morning of Sunday last, while the above stated case was under the consideration of the jury, he came out of one of the jury rooms, where he and one of the other members of the jury had retired for consultation on the case, and found one of the constables of the court sitting at the stove in the court room, in the midst of the jury. That there was some one sitting during the entire night, or most of it, on the inside of the door of the court room in which the jury were deliberating. That as soon as this affiant became aware of the presence of said constable immediately in the midst of the jury sitting by the stove, he indicated his desire to said constable that he retire, which he did. That he does not know how long said constable had been in communication with the jury and sitting with them around the stove, for he had been asleep during a good portion of the night."

*Mr. George Johnstone*, for appellant.

*Mr. Schumpert*, solicitor, contra.

March 29, 1890.    The opinion of the court was delivered by

MR. JUSTICE MCIVER.   I concur in the conclusions reached by the Chief Justice. The rule, as I understand it, in regard to expert testimony, is, to use the language of Mr. Justice McGowan in *State* v. *Coleman* (20 S. C., at page 452), that the opinion of the expert "should be given in the abstract, rather than in the concrete, upon the facts proved, and not the general merits of the case, though they may give an opinion upon a similar case hypothetically stated." So that here, while it was competent for Dr. Pool to give an opinion as to what agency was capable of producing such marks as he found upon the person of the deceased, it was not competent for him to go on and express an opinion that such marks were in fact produced by a particular agency—the human hand. That was a question for the jury, and not the witness, to decide. There was testimony tending to show that the marks found on the body might have been produced by disease, or by the use of a rope, or by the hand, and it was for the jury to determine from the testimony, whether they were in fact caused by one or the other agencies; and it seems to me that it was error to permit the witness to express his opinion on that point.

Then as to the admissibility of the declarations, as they are termed, made by the deceased when under examination before a trial justice, I think they were clearly inadmissible. As I understand it, sometime before the alleged homicide was committed the deceased was examined as a witness in a prosecution commenced by her against old Mrs. Senn, her mother-in law, for assault, and in the course of her testimony in that case she stated that her husband, David N. Senn, had made certain diabolical threats against her, and this statement the trial justice was permitted to testify to in this case, upon the ground that the statement having been made in the presence of David N. Senn (for he was present at the trial before the trial justice), and not denied by him, amounted to an admission on his part that he had made such threats. It will be observed that the deceased did not, directly addressing herself to her husband, charge him with making these murderous threats, but her statement was made while on the stand as a witness in a case against another person; though it is

somewhat difficult to understand what threats made by her husband against her had to do with a prosecution against old Mrs. Senn for an assault upon the witness.

While it may be true, as a general proposition, that where a person is charged with an offence and remains silent under the accusation, his silence is regarded as an implied confession of the truth of the charge, because the presumption is that an innocent person would not remain silent under a false accusation made against him; yet this proposition is not universally true, and it depends largely upon the circumstances under which the accusation is made, as is shown by the case of *State* v. *Edwards*, 13 S. C., 30. In that case several persons were charged with burglary and larceny, and one of them, Rodgers, after his arrest, made a full confession of his guilt, "and said in the presence and hearing of the other defendants that they were present aiding and participating in the larceny. To this statement of Rodgers there was no dissent by any of the other defendants, one of them remarking to the prosecutor: 'We know you have got us, and we want you to be as light as you can.' The others heard this remark, but said nothing." The Circuit Judge having charged the jury that if a person hears a criminal charge made against him and says nothing, it is an admission of the charge, and the court will accept it as his confession, this court, upon appeal, held such instruction erroneous. Willard, C. J., in delivering the opinion of the court, using this language: "To give the silence of parties such legal effect is equivalent to holding that every person accused of crime by any person, regardless of time, place, or circumstances, is bound to deny such accusation and affirm his innocence. It is clear that the law imposes no such obligation on a party accused." As is said in 1 Greenl. Evid., sec. 197, after speaking of other qualifications of the rule respecting the effect of silence: "The circumstances, too, must be not only such as afforded him an opportunity to act or to speak, but such also as would properly and naturally call for some action or reply from men similarly situated." And in a note to that section it is said: "To affect a party with the statements of others, on the ground of his implied admission of their truth by silent acquiescence, it is not enough that they were made in his presence; for, if they

26 -32

were given in evidence in a judicial proceeding, he is not at liberty to interpose when and how he pleases, though a party; and, therefore, is not concluded," citing several cases.

Now, in this case the charges made against David N. Senn were made under such circumstances as not only did not call for, but did not permit, any reply from him. He had no right to interpose a denial, or otherwise interfere with the examination of a witness in a case to which he was not a party, and his failure to do so should not be allowed to affect him in any way. True, it is said that David N. Senn was offered an opportunity to testify in the case and declined to avail himself of the offer, possibly for the reason that he knew nothing about the case, or possibly for the reason that he did not wish to testify in a controversy between his wife and his mother. But suppose he had gone upon the stand as a witness in that case, the rules of law would not have permitted him to contradict the charges made by his wife against him, as such charges were wholly immaterial to the issue then being tried. It seems to me, therefore, that there was error in permitting the trial justice to testify to declarations made by the deceased, in the course of her testimony in another case, tending to show that the prisoner entertained murderous feelings against her.

Again. I am not prepared to assent to the proposition that the testimony given by the two prisoners before the jury of inquest could be given in evidence in this case against them; and certainly not that it could be proved by parol, when it appeared that such testimony had been taken down in writing and was then in court. It is essential to the admissibility of the admissions or confessions of a party charged with crime that they should be free and voluntary. Now, when a person, though not at the time charged, or even suspected, of the crime, is summoned before a coroner's inquest and compelled to testify (for the law does compel persons so summoned to testify), I do not see how such testimony can be regarded as such a free and voluntary statement as would justify receiving it in evidence, when the person so testifying is afterwards charged with the crime. It is true, that when examined as a witness he may decline to make any statement tending to criminate himself, but the moment he

does so he at once excites suspicion of his guilt; or he may not know at the time what effect his testimony may afterwards have. It seems to me, therefore, that the only way to preserve in its integrity the well settled rule that a person cannot be required to furnish testimony against himself, is to hold that, if examined before a coroner's jury or a committing magistrate, the testimony which he is then required to give cannot be used against him in a prosecution subsequently brought against him. As there is no decisive authority in this State upon this point, so far as I am informed, and as the authorities elsewhere are conflicting, we are at liberty to adopt such rule as we think most in conformity with settled principles, and as it seems to me that the rule above indicated is of that character, I think it should be adopted.

It seems to me, also, that the fact that persons other than members of the jury were permitted to mingle with the jurors while they were deliberating on their verdict, requires that this verdict should be set aside. While I subscribe fully to the doctrine that the court will not listen to affidavits tending to impeach the verdict of a jury by showing what passed between the jurors while deliberating on their verdict, or the motives or reasons which may have induced some or all the jurors to reach the conclusion evidenced by the verdict as announced; yet it seems to me that where it is made to appear that the jury, after retiring to their room, have been exposed to outside influences, the court should, without inquiring whether such influences have been exerted, set aside the verdict. The privacy of the jury room has always been regarded as sacred, and the law contemplates that all proper precautions should, as far as practicable, be taken to preserve the jury even from the chance of being operated upon by outside influences, and where it appears, as it does in this case, that the jury have been exposed to outside influences, I think it is sufficient ground to set aside the verdict.

The fact relied upon as an excuse or explanation of the presence of the constables with the jurors while they were deliberating on their verdict—that the jury had left their own room and had taken possession of the court room, was itself a violation of the well settled practice. It does not appear that any permission was obtained from the judge to leave their own room and use the

court room for their deliberations.   No doubt, if application to
that effect, based upon sufficient reasons, had been made to the
judge for such permission, it would have been granted; but in
granting it there can be no doubt that the judge would have
required proper precautions to be used to preserve the jury from
exposure to outside influences.   The fact that the jury, without
authority, left their own room and took possession of the court
room, certainly did not justify or excuse the presence of the con-
stables with the jury while they were engaged in deliberating on
their verdict.

The majority of the court having reached the conclusion that
there was error of law in the trial below, the judgment of this
court is, that the judgment of the Circuit Court be reversed, and
that the case be remanded to that court for a new trial.

MR. CHIEF JUSTICE SIMPSON concurred in this opinion.


MR. JUSTICE McGOWAN, *dissenting* [omitting his statement,
which has already been given].   The charge in this case was
singularly atrocious, being nothing less than the foul, treacherous
murder of the wife by her husband in conspiracy with his para-
mour.   The evidence was entirely circumstantial; but the Cir-
cuit Judge before whom it was offered, after listening to "earnest
and eloquent argument" from defendant's counsel, refused to
grant a motion for a new trial, upon the ground of the insuffi-
ciency of evidence; and, therefore, this court has no right what-
ever to consider that subject.   Our only province is to determine
whether, in the rulings as to the admission of testimony or the
conduct of the jury, there was such error of law, or irregularity,
as should avoid the verdict.

In respect to the last exception (9), it cannot be necessary
to do more than repeat what this court said in the case of *State*
v. *Coleman* (20 S. C., 455), that "we know of no law or practice
which would permit us to hold a Circuit Judge in error for
instructing the jury that the phrase 'reasonable doubt,' used in
the books, means a 'serious, well-founded, substantial doubt.'"
Substitute the word "strong" for that of "serious," and the cases
are identical.   (The State of Nevada has actually passed an act
undertaking to define the phrase "reasonable doubt.")

Exception 8 is answered by the judge himself, "that he had no remembrance of speaking of D. N. Senn and Helena Boland as husband and wife, but if so, it was a mere slip of the tongue, obvious to all, incapable of misleading any one, and not objected to at the time, when it might have been corrected."

Exception 6 alleges error in allowing Dr. Pool to be recalled before the evidence was closed, to supplement his testimony, by adding that he thought that Senn, in the conversation before referred to, told him that he had given his wife laudanum. This was objected to, upon the ground that Senn had not denied the statement, and therefore it was not in reply. We cannot say that the necessary discretion given to the trial judge was abused. (See *Cantey* v. *Whittaker*, 17 S. C., 527.)

Exception 3 charges that it was error to admit the testimony of Peterson; that as trial justice he had, at the instance of the deceased, issued a peace warrant against her husband, the defendant, Senn. The simple fact that such a warrant issued—not the details or merits of it—surely tended to show the relation which existed between Senn and his wife, and therefore was "germane" to the issue, and receivable in evidence.

Exception 2 alleges error in admitting testimony that the deceased, in her life-time, had, in the presence of her husband (Senn), charged him with having made the threatening declarations to her (before stated), and that Senn was present and did not deny the charge. We are not able to distinguish this from the ordinary case, where a declaration is made in the presence of another, who does not deny it. "Although neither the evidence nor declaration of a wife is admissible against the husband on a criminal charge, yet observations made by her to him upon the subject of the offence, to which he gives no answer, or an evasive reply, are receivable in evidence as an implied admission on his part." Rosc. Crim. Evid., *54.

Exception 1 complains of error in allowing Dr. J. T. Pool, a physician, to express his opinion as to what the streaks and bruises on the neck of the deceased "were made by." The doctor did not undertake to say that the bruises were made by the defendants, or either of them; but after giving a full description of certain bruises which he saw, he said that he was of opinion

that they were made by some external force, but what that force was he could not say ; he was inclined, however, to think it was a hand. This testimony may not have been entitled to much weight, but we cannot say that it was inadmissible. "Opinions of medical men are constantly admitted as to the cause of disease or death, or the consequences of wounds," &c. 1 Greenl. Evid., § 440.

Exceptions 4 and 5 complain of error in admitting the testimony of J. N. Bass as to the statements of defendants under oath at the inquest before him as coroner. The statements referred to were made by the defendants at the first inquest, August 25, and they (defendants) were not arrested, on the charge of being principals in the murder, until a week after—on September 3rd. It seems to us that this is a novel question. To be admitted in evidence, confessions, or declarations in the nature of confessions, must be voluntary, and therefore when made under the charge of crime, they are not, as a rule, regarded voluntary. But it has never been doubted that declarations made by one not a party, but in a prosecution against another, are deemed voluntary, and as such may be subsequently used against him. See 1 *Greenl. Evid.*, § 225. As in the late case of *State* v. *Jones* (29 S. C., 201), where the only question was whether, in the matter of contradicting a witness, his written statement before the coroner was admissible against him, and it was rightly ruled that it was admissible for that purpose,

This being the law, the inquiry was soon made as to what should be the rule when the statement was made by one not a party at the time, but made so afterwards. The test being whether the statement was voluntary at the time it was made, the difference would seem to be small, between a case where the charge was against another, and where there was no charge at all. The earlier cases, however, seem to have taken the other view, and to have held that the subsequent charge and arrest operated retrospectively, and made the prior statement involuntary and therefore inadmissible. Mr. Greenleaf, whose excellent book on evidence was written in 1844, confessed that at that time such was the tendency, although, as he stated, "it might seem to be at variance with the general principle in regard to the testimony

given in another case." See section 226 and note. He stated the authorities for that view.

But the later cases seem to have considered the matter differently, and to have corrected the "variance" pointed out by Mr. Greenleaf; and have, as we think in accordance with principle and all the analogies, settled the law otherwise. See Rosc. Crim. Evid. (7th edit.), and *79, where it is said: "The prisoner's deposition on oath, in reference to another inquiry, is clearly admissible. 3 Russ. Crim., 411, 4th ed. It was, however, formerly doubted whether, if a person who had given evidence before a coroner, were afterwards made the subject of a criminal charge arising out of the same facts, his deposition could be given in evidence against him (citing the early cases); but in several later cases they have been admitted. *R.* v. *Owen*, 9 C. & P., 238 (38 E. C. L. R., 99); *R.* v. *Colmar*, 9 Cox C. C., 506, and others. In *R.* v. *Biggadike* (Lincoln winter assizes, 1868), Byles, J., admitted in evidence a statement upon oath, made by the prisoner voluntarily, and before she was in custody, not signed by her, but taken down by the coroner at the time. The coroner was called. His lordship said the authorities were in favor of the admissibility of the evidence, and he himself had no doubt on the subject. The prisoner, who was charged with wilful murder by poisoning, was sentenced to death and hanged," &c. We cannot say that the testimony was inadmissible.

Exception 7 renews, as grounds of error, all the points urged upon the motion for a new trial. We are not sure that we understand precisely what is meant by (e) that there is now no law under which the defendants could have a trial or be convicted. As to (d), alleging "a variance" between the allegations of the indictment and the evidence in the case, in this, that the name of the person with whose death the defendants are charged is alleged to be M. Ozella Senn, the evidence being that her name was Melissa Ozella Senn. There is no copy of the indictment in the Brief, so that it cannot be certainly known how the name is therein stated. Besides, after trial and verdict, it is too late to make the objection. Courts will take judicial notice of the customary abbreviations of Christian names. *Stephen* v. *State*, 11 Ga., 225.

Point (a) complains that two constables were present with the jury during a portion of the time the case was under advisement. We observe that one of the affidavits of a juror states that he found one of the constables of the court "sitting at the stove in the court room in the midst of the jury—in the court room in which the jury were deliberating." This makes it plain how the constable happened to be in the room. It is obvious that the constables did not go into the jury room proper, but the jury, being up all night, returned into the court room, where they could warm by the stove, and where they found the constables on duty. This was really no fault of the constables, and it was in truth merely a casual presence, without any intrusion or evil intent. As was said by this court in *State* v. *Nance*, 25 S. C., 172 : "Great care should be taken, especially in State cases, to guard the jury against all irregular and improper influences ; but there may be objections more fanciful than real." The court cannot lend a ready ear to disclosures coming from the jury room. There is not the slightest allegation that the constables exercised or attempted to exercise any influence upon the jurors. A wise discretion must be exercised, and, in doing so, we cannot regard the accidental presence of the constables in the court room, as an irregularity of so serious a character as to set aside the verdict. See *State* v. *Nance, supra ; McCarty* v. *McCarty*, 4 Rich., 598 ; and *State* v. *Tindall*, 10 Rich., 212.

But points (b) and (i) make an objection of a different character as to "the verdict," which, it is said, taken in connection with the evidence, is contradictory, and other affidavits of jurors are introduced to assail it. If the verdict were inconsistent, we do not very well see how that could be error of law. The affida vits undertake to state the manner in which the verdict was reached, and especially that the recommendation to mercy was to induce a commutation of the death penalty. It is very clear that it can have no such effect. The court is bound to take the verdict as it was rendered, and refuse to listen to any affidavits of jurors tending to impeach it. There are reasons of public policy why jurors should not be heard to impeach their verdict, whether by showing their mistakes or their misconduct. Neither can they be properly permitted to declare, with a view to affect their ver-

dict an intent different from that actually expressed by their verdict as rendered in open court. See *Smith* v. *Culbertson*, 9 Rich., 111; *State* v. *Tindall*, 10 Rich., 213; 3 Graham & Waterman on New Trials, p. 1428, and cases cited. In the case of Culbertson, Judge Wardlaw, in pronouncing the unanimous decision of the old Court of Appeal, said: "The mischiefs, the delays, the arts, the scandal, likely to ensue, come naturally to our thoughts, when we imagine encouragement given to the pursuit of jurors by disappointed suitors, for the purpose of obtaining affidavits to invalidate verdicts regularly rendered. * * Whether they have been misled by sophistry or mistake, or have adopted the determination of a majority or of a chance, they have upon their oaths unanimously rendered a verdict in solemn form, and high considerations of justice and policy place that verdict beyond their future influence."

We think the defendants have had a fair trial, defended with the greatest earnestness and zeal by able and eloquent counsel. The duty devolved upon the court is a painful one; but finding no errors which would justify us in setting aside the verdict, it only remains for us, with becoming regret, but with firmness, to discharge that duty.

Upon this dissenting opinion was endorsed by

MR. CHIEF JUSTICE SIMPSON. I think a new trial should be had in this case, because Dr. Pool was allowed to say that he was inclined to believe that the marks on the throat of the deceased were made with a "hand;" this, it seems to me, was the expression of an opinion beyond the limit of a medical expert in such a case as this. And also because of the admission of declarations of Mrs. Senn made before the trial justice, charging her husband with having made certain bitter expressions against her, to which he made no reply. As I understand it, Mrs. Senn was being examined by the trial justice in a case before him, when she made these declarations, and though Senn, her husband, was present, yet under the circumstances he was not called, nor could he have properly interposed a denial. For these reasons I am unable to concur in this opinion. Rosc. Cr. Evid., *p. 56, and the notes.

Judgment reversed.