14206

STATE v. EMORY

(183 S. E., 323)

462

*Messrs. John C. Williams, John C. Lanham* and *C. C. Brown,* for appellant,

*Mr. Samuel R. Watt, Solicitor,* for the State.

January 14, 1936.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This case, the *State v. Fred Emory*, comes to this Court on appeal by the defendant following his conviction in the Court of General Sessions for Spartanburg County, on the charge of .having, on June 7, 1935, unlawfully shot and killed a Negro man by the name of Gus Bivins, at Tucapau Mills, in said county of Spartanburg. The case was brought to trial in said Court before his Honor, Judge G. Dewey Oxner, and a jury, July 23, 1935, resulting in a verdict of guilty with a recommendation to the mercy of the Court. A motion by the defendant for a new trial was denied by the presiding Judge. Thereafter, September 28, 1935, the defendant made a motion for a new trial on after-discovered evidence. This motion was also refused, and, from the verdict, rulings, judgment and sentence, and from the orders refusing a new trial, the defendant has appealed to this Court. In this connection it may be stated that, Judge Oxner having left the circuit, the motion for a new trial on after-discovered evidence was argued before his Honor, Judge T. S. Sease.

In his exceptions the appellant imputes no error to the trial Judge in the admission of testimony or in the charge to the jury, but the exceptions impute error in refusing the motions to grant a new trial and set aside the verdict.

The first exception imputes error to his Honor, Judge Oxner, in denying the defendant's motion to set aside the verdict of the jury and grant a new trial for the following reasons:

"(A) In that the verdict was dictated by passion and prejudice, it having been impossible to secure an unbiased and unprejudiced panel of jurors ·from the venire attending Court during the week of the trial.

"(B) In that his Honor erred in sending the jury out of their room to a hotel at the supper hour, a distance of several hundred yards, without the knowledge or consent of the defendant or his attorneys.

"(C) In that his Honor erred in swearing as witnesses the bailiffs who attended the jury in going to and from the hotel and in having supper in the diningroom of the hotel.

"(D) In that his Honor erred in permitting the Solicitor to ask leading questions in examining the bailiffs who were so sworn, and in holding that it made no difference if leading questions were asked of these court officials by the prosecuting Solicitor."

In answering the question raised under Subdivision A of this exception, we deem it sufficient to state that a reading of the record fails to convince us that any showing was made before Judge Oxner or during the trial of the case which could have caused his Honor to reach the conclusion that the verdict of the jury was the result of passion and prejudice, or that there was anything to convince Judge Oxner that the panel of the jurors was biased and prejudiced. Therefore his Honor, Judge Oxner, properly overruled the motion on this ground.

The question raised under Subdivision B of this exception presents a serious question, wherein it is contended that his Honor erred "in sending the jury out of their room to a hotel at the supper hour, a distance of several hundred yards, without the knowledge or consent of the defendant or his attorneys." Great care should be exercised in all cases to protect the jurors from coming in contact with third parties, and especially is this true after the testimony is concluded, the jury charged and sent to the room for deliberation. In our opinion, it is unwise for the jury to be taken from their room of deliberation to a hotel unless there are special and necessary reasons for doing so, and then it should be done under the greatest care and protection, and should never be done without the direction of the trial Judge, and should be brought to the attention of counsel representing the respective parties at the time in question. In moving before Judge Oxner for a new trial on the grounds that the jury had been permitted to go to the

hotel after they had retired to the room of deliberation, counsel for the defendant presented the following affidavit made by a member of defendant's counsel:

"Personally appeared before me John C. Williams, who, after being duly sworn, deposes and says that he is one of the attorneys for the defense in the above-entitled case. That he has been informed by Mr. W. B. Wilson, bailiff for the Court of General Sessions of Spartanburg County, that the said W. B. Wilson was ordered and instructed by his Honor G. Dewey Oxner, presiding Judge, to take the jury in the above case to the Gresham Hotel for supper, after said jury had returned to their room and had deliberated on the above case for a period of approximately nine and one-half hours.

"The deponent further swears that he is informed that the above took place between the hours of 7 and 8 o'clock P. M. And the deponent would further show to the Court that the Gresham Hotel is situated at a distance of approximately three or four hundred yards from the Court House and that the street between the Spartanburg County Court House and the Gresham Hotel over which the above jury was required to walk to and from said hotel was crowded with people. That persons other than members of the jury were thereby permitted to mingle with the jurors while they were deliberating on their verdict and that the jury was therefore subjected and exposed to outside influences during their trip to and from the said Gresham Hotel and while they were having supper in the public dining room of said hotel.

"That the deponent would rather show to the Court that the said jury was taken to and from said Gresham Hotel without the knowledge, consent or permission of the attorneys for the defendant.

"John C. Williams."

As appears from the language contained in this affidavit, the essential part of the same was not based upon the personal

knowledge of the affiant, but was based upon information alleged to have been acquired from one of the bailiffs who had charge of the jury at the time in question. In passing upon the motion to grant a new trial on the grounds set out in the said affidavit, the following occurred:

"The Court: Well, I think perhaps I want to swear these bailiffs; I notice one statement that I ordered the jury carried to the Gresham Hotel; I think that is in error.

"Mr. Williams: Yes, sir; I dictated that in a hurry.

"The Court: I directed the bailiff about seven o'clock to give the jury supper, carry the jury out to supper; and I will have to swear those bailiffs. The only question in my mind whether I had better do it now or recess; it is getting pretty late.

"The Solicitor: Suppose we come back at three o'clock.

"The Court: All right; I want all these jurors back here; gentlemen, I might find it necessary to ask them some questions; I am going to recess Court until three o'clock. (Court reconvenes at 3 p. m.)

"The Court: All right, Mr. Clerk, I want these two bailiffs to come around.

"Mr. W. B. Wilson, being duly sworn, testified:

"Examination by the Court:

"Mr. Williams: Now, your Honor, the defense objects to the Court going into an investigation of this matter, since the Supreme Court said they were not interested as to whether the outside influences were exercised; the fact that the jury was allowed to mix and mingle and be exposed to the outside influence; whether or not it was exercised, they were not interested in that point; so I am objecting, your Honor, to the Court going into an investigation.

"The Court: All right, I am taking the testimony over the objection.

Q. Now, Mr. Wilson, I believe you were designated to act as one of the bailiffs in charge of the jury in this case? A. Yes, sir.

"Q. And as I recall the case was given to the jury upon the conclusion of my charge about ten o'clock yesterday morning? A. Yes, sir.

"Q. At the lunch time, how was the jury fed? A. You mean yesterday evening?

"Q. Yesterday at lunch, in the middle of the day? A. We fed them in the room.

"Q. On my instructions? A. Yes, sir.

"Q. And then did you give the jury supper late yesterday afternoon upon my instructions? A. I did.

"Q. I believe in the affidavit it is stated the Court instructed you to carry the jury to supper at the Gresham Hotel; and counsel states that was inadvertently put there; I don't believe I instructed you as to any particular place? A. No, sir.

"Q. I only instructed you to carry the jury out to supper? A. Yes, sir.

"Q. Then what time did you carry the jury out to supper? A. It was something after seven o'clock. I didn't look exactly, something between seven and eight; it was getting dusk.

"Q. Where did you carry the jury to supper? A. Gresham Hotel.

"Q. And who else was in charge of the jury along with you? A. Mr. Murph.

"Q. Mr. Murph? A. Yes, sir.

"Q. In carrying the jury from the jury room down to the Gresham Hotel for supper, was the jury carried in a body or were they allowed to mingle with anyone? A. No, sir; I had them close bunched; close as they could walk; and I crossed the street right over here in order—this side of the street there are more people on it, generally full all the time, and I crossed on the opposite side, the same side the hotel is on.

"Q. Was the jury kept in a body until they were carried in the dining room at the Hotel? A. Yes, sir; well I marched them right on in and set them down at the table.

"Q. You marched them in a body? A. Yes, sir; a man was behind and I was in front.

"Q. Mr. Murph was behind? A. Yes, sir, and I was leading.

"Q. And you walked in front of the jury? A. Yes, sir.

"Q. When you got down to the hotel for the jury to eat, did the jury eat together? A. They sure did, yes, sir.

"Q. Was anyone around the jury when they ate? A. No, sir; the man that takes the victuals out, they put it on the table and they went out, and no one in the dining room but us.

"Q. No one was in the dining room except whom? A. The twelve jurymen and us two bailiffs.

"Q. And then when the jury finished eating, did you bring the jury immediately on back? A. Yes, sir.

"Q. Was the jury kept in a body? A. Yes, sir; when I got down to the steps, I said 'hold on a minute,' and I counted the whole twelve, and they were close as they could get together.

"Q. In going to and from the hotel, did anyone get near the jury? A. No, sir; of course, they were sitting in front of the hotel as we passed; I don't suppose the whole street there was twenty-five people from here down on that side.

"Q. Did anybody say anything? A. Not a thing, not a word said.

"Q. During the whole time the jury was out of the room, did anyone speak to the jury or say anything in the presence of the jury? A. Not a thing.

"Q. How long were you gone, Mr. Wilson, from the time you left the jury room until you returned? A. I suppose we were gone half an hour; everything was ready when we got there and we eat quick as we could.

"The Court: Any question any of you gentlemen—

"The Solicitor: I would like to ask him a question or two.

"Q. Mr. Wilson, how long have you acted as bailiff here and had charge of juries when they were deliberating? A. If

I live to see the end of this year, it will be seven years; I went in with Mr. Bennett.

"Q. How was the weather yesterday? Was it a very hot day? A. It was hot; yes, sir.

"Q. And as I understand, the jury were lined up; were they lined up two by two behind each other? A. Lined them up right out there.

"Mr. Williams: Now, your Honor, all of them are leading questions.

"The Court: I don't think it makes any difference here.

"The Solicitor: Q. They were lined up two by two? A. Yes, sir.

"Q. And as I understand, you led the way from here to the Gresham Hotel with the jury marching behind you two by two? A. Yes, sir.

"Q. And Bailiff Murph followed the jury? A. That is correct.

"Q. Is the Gresham Hotel about the nearest eating place to the Court House? A. Hotel it is, yes, sir.

"Q. And would you or not more than likely come in contact with fewer people in going to the Gresham Hotel than you would an eating place up toward Main Street? A. Yes, sir.

"Q. And you say no one talked to the jury on the way down? A. No, sir.

"Q. Was it possible for the jury to have heard anyone discuss this case or anything else on the way down? A. I don't think so, all I heard one man say, 'There goes the jury.'

"Q. That is the only thing you heard? A. Yes, sir.

"Q. And when you got into the dining room, you have already told the Court where the jury sat; where did you and Bailiff Murph sit? A. Suppose the hotel is this way, the big table was across there, and this was right here; I was sitting facing; I had my eyes on them nearly all the time.

"Q. You all were sitting at a table separate and apart from where the jury was? A. About ten feet.

"Q. Both you and Mr. Murph? A. Yes, sir.

"The Court: The jury all ate at one table? A. Yes, sir; I marched them right in.

"Mr. Watt: Q. No one was in the presence of the jury that could talk to them while they were eating? A. No, sir; no one but the waiters.

"Q. As you brought them back from the hotel to the Court House, did you again march them in the same manner? A. I got out on the street and stopped them and counted them all twelve, and Mr. Murph got behind and we come right on in.

"Q. Did anyone mention the case on the way back to them or any other persons? A. No, sir; not a word was said.

"Q. Then they were brought back and put in the room? A. Yes, sir, brought them back to the foot of the steps and the Sheriff locked them up.

"The Court: Any questions you want to ask the witness?

"Mr. Williams: Q. Mr. Williams, I believe you stated you saw about twenty-five people going down and about twenty-five coming back? A. On the street, I mean, and all those sitting in front of the hotel; we didn't meet five people walking.

"Q. Where did you meet the first person? A. Right about that cross street down there, Walnut Street.

"Q. Where did you meet the second one? A. Down there just below the drug store.

"Q. That is number two; where did you meet the third? A. I don't know whether we met another one or not; the next I remember was those people we saw in front of the hotel.

"Q. When you got to the hotel, did you have supper already prepared for the gentlemen of the jury? A. It was already prepared.

"Q. Had you called up in advance and had it propared? A. I didn't.

"Q. Was the dining room open when you got there? A. Yes, sir.

"Q. Was the dining room door open? A. No, sir, Mr. Smith opened it and passed back out.

"Q. Were there anybody sitting in the lobby? A. No, sir, not that I noticed.

"Q. Anybody in the dining room? A. Not a one but us.

"Q. That was kind of a deserted hotel was it? A. Just about until we got in there.

"Q. How many waiters did you have? A. Just two.

"Q. Did they wait on the jury? A. Yes, sir, they brought the stuff in.

"Q. Did the jury give their orders? A. Of course, I don't see how else they could do it.

"Q. Did any of those gentlemen call for a paper or anything? A. One wanted one and I told him he couldn't get it.

"Q. Did the paper boy come up to sell papers? A. He hollered at us as we went on down, and I said 'get back boy.'

"Q. Did the paper boy run up and show the headlines and holler paper? A. No, sir. I don't think so; he come up and we passed by.

"Q. And had not one of the gentlemen already expressed a desire to you that he wanted a paper? A. Yes, sir.

"Q. How is that? A. Yes, sir, one wanted to get a paper and I wouldn't let him have it.

"Q. Then the paper boy came running— A. No, sir, that was before.

"Q. How many people were in front of the Court house as you went out? A. I suppose twenty or twenty-five sitting around out there.

"Q. Sitting all along out there; could you tell what they were discussing? A. No, sir.

"Q. You were at the front of this column, were you not? A. Yes, sir.

"Q. Could you hear everyting all the jurors said behind you? A. I could hear a good deal; most I heard them talk-

ing about was a meeting going on in the country, talking about a certain preacher.

"Q. You were looking ahead? .A. I was looking back occasionally.

"Q. You were the leader, you had to look forward? A. Well, I could cast my eyes back.

"Q. But they could have talked to somebody on the side line when you were not looking back? A. I don't think so, we walked pretty pert.

"Q. How old are you? A. Seventy-three.

"Q. You can still get about pretty pert, can't you? A. Yes, sir, sure.

"The Solicitor: Q. And your hearing is still good, is it? A. Yes, sir, good as it ever was."

H. T. Murph, the other bailiff jointly in charge of the jury with Mr. Wilson, testified, in effect, on the question involved, the same as the bailiff, Mr. Wilson, and, in order to avoid making the opinion unnecessarily lengthy, we will not quote his testimony.

From the testimony given by the two bailiffs in charge of the jury, it clearly appears that the jury was not subjected to any outside influence by being taken to the hotel for the purpose of being given their evening meal. Therefore the trial Judge committed no error in refusing to set the verdict aside and grant a new trial on this ground. In support of appellant's contention for granting the motion under consideration, appellant's counsel cite the case of *State v. Senn,* 32 S. C., 392, 11 S. E., 292, 298, and the case of *State v. Campbell,* 144 S. C., 53, 142 S. E., 31. An examination of these cases shows that the facts involved therein on the question under consideration are not similar to the facts involved in the case at bar. There was no mingling with constables or others in the case at bar as was done in the case of *State v. Senn* and the case of *State v. Campbell, supra.*

In our opinion, there is no merit in the questions raised under subdivisions C and D of this exception.

The trial Judge was right in swearing the bailiffs and examining them for the purpose of ascertaining what had taken place, if anything, when the jury was taken to the hotel in question for the purpose of being given their evening meal. Also, in our opinion, the appellant was not prejudiced by the leading questions asked the bailiffs by the solicitor in the course of his examination and it was proper for the solicitor to assist the trial Judge in ascertaining the truth of that situation.

The allegations of error set forth under Exception 2 read as follows:

"2. For that his Honor Judge Thomas S. Sease erred, it is respectfully submitted, in refusing the defendant's motion to set aside the verdict of the jury and to award a new trial to the appellant, on the grounds of after-discovered evidence, for the following reasons:

"(A) In that the evidence before Judge Sease was sufficient to show him that the defendant had not had a fair trial at the hands of an impartial jury under the circumstances of the case and under the facts stated in the affidavits.

"(B) In that his Honor did not examine the affiants who made the affidavits of prejudice on the part of two of the trial jurors, even though the State's attorney had subpoenaed these affiants to appear for the hearing of the motion before Judge Sease, and they were in the Court room at the time.

"(C) In that his Honor goes out of the record to bolster the character of two jurors who were alleged to have made statements showing their prejudice, and to call attention to the fact that no supporting affidavits had been served by the appellants."

The allegations of error raised by this, the second exception, are imputed to the resident Judge, his Honor, Judge T. S. Sease; Judge Sease having heard the motion for a new

trial on after-discovered evidence due to the fact that the trial Judge, his Honor, Judge G. Dewey Oxner, had left the circuit before this motion was heard. In support of this motion, there appears in the transcript of record affidavits to the effect that R. R. Edge and H. B. Snow, who were later selected as members of the jury that tried the defendant in this case, stated before the trial of the case that the defendant, Fred Emory, ought to be electrocuted, and these affidavits further, in effect,. stated that the parties making the affidavits did not advise anyone of this until after the trial in question. There also appears of record an affidavit by the attorneys for the appellant that they did not learn of the statements made by these jurors until after the trial and conviction of the defendant. There are also affidavits in the record by the said jurors, H. B. Snow and R. R. Edge, denying absolutely making the statements attributed to them regarding the defendant. Affidavits were also introduced as to the good character and high standing of these jurors.

After hearing the motion and considering the several affidavits introduced in the cause, his Honor, Judge Sease, made the following ruling:

"At the July, 1935, term of this Court, which convened on July 22nd, the defendant was convicted of murder with recommendation to mercy, and sentenced by Judge Oxner, presiding by special assignment. Notice of intention to appeal was served by the defendant within ten days after the rising of the Court. The appeal has not been perfected, and the Solicitor consented to an order extending time therefor.

"On September 14, 1935, the attorneys for the defendant served the Solicitor with notice of a motion, to be made before Judge Oxner, for a new trial on the ground of after-discovered evidence, supporting the motion with affidavits, the first of which was sworn to on July 30, 1935. In brief substance, the after-discovered evidence claimed was that two jurors, R. R. Edge and H. R. Snow, had, prior to the

trial, made statements plainly showing prejudice and bias against the defendant, in that Snow was charged with having said, 'Fred Emory is going to be tried tomorrow morning. Damn him, he ought to get the electric chair. If I get the chance to set on his jury, I'm going to see to it that he gets the electric chair'; and Edge was charged with having said 'that the damn son of a bitch ought to be electrocuted.'

"Judge Oxner declined to hear the motion for want of jurisdiction, he having long since left the Circuit, to which he was specially assigned to hold the July General Sessions Terms.

"Thereafter, the motion was renewed before me upon the same affidavits, with additional affidavits from the attorneys undertaking to show their due diligence. The State contended that I was without jurisdiction because of the pendency of the appeal to the Supreme Court, citing Rule 24 of that Court and the cases construing it. I overruled the State's contention and heard the motion on the merits.

"Mr. Edge, one of the jurors assailed by the affidavits, has been known to me for a number of years, and it is a pleasure for me to record here that he has always been a man of high reputation for integrity and good citizenship. I have known the Snow family for a number of years, and they enjoy the same sort of reputation. They both deny making the statements attributed to them, or having discussed the case with any of the affiants at any time prior to the trial. In addition, numbers of affidavits of citizens of this county of the highest reputation and standing testify by affidavit to the good character and high moral standing of these two jurors. No affidavits were presented supporting the character and reputation of the affiants who claimed to have heard the attributed statement.

"The showing convinces me, and I find as a matter of fact that neither of the jurors charged in the affidavits supporting the motion ever made any such statement as is attributed to them or either of them.

"The preservation of the sanctity of the jury panel is essential to the preservation of our government. Assaults upon the personnel of juries by these motions on claimed after-discovered evidence should not be encouraged. It is too easy for irresponsible persons to be found who might recklessly and falsely attribute to jurors of unquestioned integrity disqualifying statements entitling a convicted defendant to a new trial. In this case, the very severity and extreme language attributed to the jurors tends to discount any credit to be given to those ascribing such statements. It is contrary to general experience that a juror would openly publish his intent to disregard his oath by indulging in such loose talk. The motion is refused. Let the affidavits upon which the motion was heard be filed along with this order."

We think his Honor, Judge Sease, correctly ruled on the motion. In this connection we call attention to the *per curiam* opinion by this Court in the recent case of *State v. Kennedy,* and authorities therein cited, reported in 177 S. C., 195, 181 S. E., 35.

The question raised under subdivision A of this exception must be answered against appellant's contention. In our opinion, his Honor, Judge Sease, was justified under the showing made before him in refusing to hold that the defendant did not get a fair trial, under the circumstances of the case and the facts presented.

As to the contention of the appellant set forth under subdivision B of this exception, we deem it sufficient to state that the method adopted by the trial Judge in ascertaining the truth regarding the fitness of the two jurors in question was largely a matter of discretion on his Honor's part. It was not incumbent upon his Honor to examine the affiants who made the affidavits in question, even if they were present, if his Honor thought that course unnecessary. We see no abuse of discretion on the part of his Honor in following the course his Honor adopted.

Regarding the position of the appellant set forth under subdivision C of this exception, we fail to see in what respect the appellant was prejudiced by his Honor stating, in making his ruling, that he had known the jurors in question for some time and, in effect, knew them to be men of honor and character. Further, according to our view, it was not out of place for his Honor, Judge Sease, in making his ruling, to state that no supporting affidavits had been served by the appellant.

The third exception is stated in the following language: "3. For that both Judges erred, it is respectfully submitted, in that the defendant has not had that fair and impartial trial at the hands of an unbiased and unprejudiced jury to which he is entitled under the law."

As we view the record presented in the case, neither the trial Judge nor the resident Judge could hold that the appellant had not had a fair and impartial trial, and properly overruled defendant's motion.

The exceptions are overruled, and it is the judgment of this Court that the judgment of the lower Court be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.